*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BRAD BARRETT,

        Plaintiff-Appellant,

v

CITY OF FLUSHING, BROOKE GOOD,
EDWARD SULLIVAN, FLUSHING CITY
COUNCIL, and JOSEPH KARLICHEK,

        Defendants-Appellees.

UNPUBLISHED
September 26, 2024
1:01 PM

No. 365671
Genesee Circuit Court
LC No. 2020-114242-CZ

---

BRAD BARRETT,

        Plaintiff-Appellee,

v

CITY OF FLUSHING, BROOKE GOOD,
EDWARD SULLIVAN, FLUSHING CITY
COUNCIL, and JOSEPH KARLICHEK,

        Defendants-Appellants.

No. 366709
Genesee Circuit Court
LC No. 2020-114242-CZ

---

Before: REDFORD, P.J., and GADOLA and RIORDAN, JJ.

PER CURIAM.

In these consolidated appeals,[1] in Docket No. 365671, plaintiff Brad Barrett appeals as of right the trial court's April 11, 2023 judgment of no cause of action against defendant City of

---

[1] See *Barrett v City of Flushing*, unpublished order of the Court of Appeals, entered August 30, 2023 (Docket Nos. 365671 & 366709).

Flushing following a jury verdict to that effect.[2] In that appeal, plaintiff argues that the trial court should have granted summary disposition in his favor and that the trial court erred in several respects during trial. In Docket No. 366709, defendants appeal as of right the trial court's June 14, 2023 order denying their post-trial request for attorney fees. In that appeal, defendants argue that they are entitled to attorney fees from plaintiff because his action was "frivolous" and, alternatively, because he rejected their pre-trial offer of judgment. We disagree with the appellants and we affirm the trial court.

## I. FACTS

In May 2020, plaintiff filed a complaint against defendants, alleging as follows. At the time relevant to this case, he was the city manager for defendant city after being hired by defendant city council for that position a few years earlier. On April 20, 2020, plaintiff was fired by defendant city through its agents, defendants Brooke Good, Edward Sullivan, and Joseph Karlichek, who were members of defendant city council at the time. Plaintiff claimed that (1) he was fired by defendants contrary to the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*; (2) defendants breached his employment contract by refusing to pay the agreed-upon contractual severance; (3) defendants committed tortious interference with contractual relations; and (4) defendants violated the Open Meetings Act, MCL 15.261 *et seq.*, because the individual defendants decided to fire him without holding a public meeting.

The parties filed multiple competing motions for summary disposition, and the documents attached thereto established the following facts. On November 5, 2019, defendants Good, Sullivan, and Karlichek were elected to the seven-person defendant city council, each replacing an incumbent.[3] In addition, Patrick Scanlon was re-elected to the same body. Apparently, there was a tension between the three newly elected members of defendant city council—the three individual defendants in this case—and the four remaining members of defendant city council.

A few weeks after the election, one of the four incumbent members of defendant city council, Dick Bade, invited plaintiff to attend a lunch at the "Liberty Diner" in late November or early December 2019 for a meeting with some city officials. Plaintiff arrived at the lunch shortly after it began. Present at the lunch were Bade, as well as Lynn Black, another incumbent member of defendant city council. In addition, as city attorney Matthew McKone later testified at trial, the three ousted members of defendant city council were present as well.

Plaintiff testified during his deposition that the subject of the lunch was "the direction" of city government, and he clearly implied that at least some of the individuals present at the lunch were concerned with the three newly elected members of defendant city council. Plaintiff also

---

[2] The other named defendants, Brooke Good, Edward Sullivan, Flushing City Council, and Joseph Karlichek, were dismissed earlier in the proceedings. However, because plaintiff challenges the trial court's dismissal of those defendants, they are involved in these appellate proceedings.

[3] In their brief on appeal, defendants refer to the three individual defendants as the "New Guard," and the four remaining city-council members, as well as the three ousted city-council members, as the "Old Guard."

implied that he was somewhat uncomfortable with the discussion, but he nonetheless did not leave. Plaintiff denied that one topic of discussion at the lunch was having the four current members of defendant city council simultaneously resign, which would leave the three newly elected members without a quorum to perform basic legislative functions. However, plaintiff acknowledged that Bade "made comments in regard to his frustration." Plaintiff did not mention this lunch to the individual defendants, i.e., the three newly elected members of defendant city council.

McKone, however, did mention the lunch to defendant Karlichek. As a result, the individual defendants met with plaintiff in December 2019, emphasizing the need for open communication.

In January and March 2020, four members of defendant city council resigned, leaving the individual defendants without a quorum. The problems created by the lack of quorum were compounded by the fact that the COVID-19 pandemic was beginning at about this time. Thus, for example, defendant city council was unable to extend a state of emergency that had been declared a few days earlier. Consequently, the individual defendants arranged for McKone to file a petition with the Genesee County Election Commission (GCEC), which is authorized by state statute to appoint at least one member to defendant city council to establish a quorum. The petition was filed on March 18, 2020, and the GCEC scheduled a hearing for March 20, 2020.

The GCEC consists of the chief probate judge, the county clerk, and the county treasurer. See MCL 168.23(1). Shortly before the hearing was scheduled to occur, plaintiff contacted the probate court administrator and an individual in the prosecutor's office, seeking to delay the date of the hearing. Nonetheless, the hearing occurred as scheduled. At the hearing, plaintiff addressed the GCEC by telephone and implied that it was unnecessary to appoint a fourth member to defendant city council because defendant city could otherwise engage in emergency operations under another state statute. However, the GCEC appointed a fourth member as originally requested.

On April 20, 2020, the four members of defendant city council—the individual defendants and the newly appointed member—voted to rescind plaintiff's position as city manager.[4] Defendant Sullivan testified at his deposition that the "straw that broke the camel's back" was plaintiff's "contact with the election commission." Defendant Good testified in her deposition that she had an "issue" with the fact that plaintiff did not tell the individual defendants about the Liberty Diner meeting, as well as the fact that plaintiff attempted to contravene the process for having a new member appointed to obtain a quorum. Defendant Karlichek testified in his deposition that plaintiff was fired because he was "dishonest without disclosing a meeting that occurred with former members of the council" at the Liberty Diner, and because plaintiff attempted "to prevent this election committee to—to determine or appoint a council person so that the City of Flushing could have quorum."

---

[4] The newly appointed member voted against the resolution, apparently because he was unfamiliar with the surrounding circumstances.

As noted, plaintiff initiated the instant action a few weeks after he was fired, identifying four separate claims. Relevant for this appeal, the parties filed competing motions for summary disposition of the WPA claim. In his motion and accompanying brief, plaintiff argued that he was entitled to summary disposition of that claim for the following reasons. First, he was "requested by public bodies, sitting Council persons, to attend a meeting at a local Restaurant (Type II whistleblower) in Flushing to answer questions . . . about the City Charter."[5] Second, he "attend[ed] a meeting (Type II whistleblower) at City Hall in December of 2019 to answer questions . . . about what [he] said and reported at the restaurant meeting." Third, he "engaged in protected activity by reporting, speaking and communicating with Judge Barkey and other public officials at the March 20, 2020 public hearing, identifying himself as City Manager." Plaintiff continued:

> Defendants herein, especially Defendant Karlichek, admitted under oath that Plaintiff Barrett's reporting, speaking and communication with Judge Barkey and other public officials at the March 20, 2020 Genesee County Election Commission public hearing, was one of the reasons why Defendants fired Plaintiff Barrett.

In response, defendants argued that plaintiff was fired because he failed to report the Liberty Diner meeting to his superiors despite the fact that he should have done so in his capacity as city manager, and because he improperly attempted to "stop[] the restoration of the legislative process" during the March 20, 2020 hearing. These reasons for discharge, defendants contended, are not prohibited by the WPA.

Ultimately, the trial court granted summary disposition in favor of defendants on the third and fourth counts of the complaint, tortious interference and Open Meetings Act violations, but declined to grant either party summary disposition on the WPA claim. Thus, the case proceeded to trial on the first two counts of the complaint, which alleged violations of the WPA and breach of contract.[6]

At trial, the individual defendants generally testified consistent with their respective depositions.[7] For example, defendant Good testified that one of the reasons for her decision to fire plaintiff was the fact that he attended the Liberty Diner meeting but did not inform the individual defendants about that meeting:

---

[5] The WPA essentially prohibits an individual from being fired for attending a hearing by a public body. See MCL 15.362.

[6] The basis for the breach-of-contract claim was that the employment contract required defendant city to pay plaintiff a severance if he was discharged, unless he committed "gross malfeasance in the office." Defendant city did not pay that severance.

[7] On the third day of trial, the trial court dismissed the three individual defendants, as well as defendant city council, from the proceedings. The trial court reasoned that the individual defendants "would be immune from suit if they do get sued as elected officials," and defendant city council is not "an entity that can be sued."

Q: Isn't it true that at your deposition you admitted to me that one of the reasons that you voted to terminate Brad Barrett's employment was because he attended a meeting in November of 2019 at a restaurant? Isn't it true that's one of the reasons?

A: Yes, that led up to me firing Mr. Barrett.

\* \* \*

Q: And so, he's at this restaurant. I mean, it's a public restaurant, right?

A: Uh-huh.

Q: I mean, what did you expect Brad Barrett to do?

A: I didn't expect Brad Barrett to do—to do anything. I don't think he—I expected Brad Barrett to have a conversation with us about it after the fact. That's all I expected him to do.

In addition, defendant Sullivan testified that one of his reasons for firing plaintiff was the fact that he communicated with the county emergency coordinator by e-mail the day before the March 20, 2020 meeting:

Q: . . . [T]oday you brought your own handwritten reasons that you wrote out on April 20th, right, as to why you terminated his employment?

A: Yeah.

Q: Okay. Well, I'm looking here on page two, and it's got he sent an email—an email to the county emergency coordinator—manager on March 19th, correct? Is that your—that's your—

A: That's the exhibit. Yes, sir.

\* \* \*

Q: And that's one of the reasons you voted to terminate his employment?

A: It's part of it, yes.

Q: Okay. Did you realize that under the support emergency operation plan for the City of Flushing, okay, that the chief administrative officer and emergency liaison checklist for consideration, that's him, the chief administrative officer, right?

A: That's what I learned here, yes.

\* \* \*

-5-

Q: So would you agree, you know, that part of his job is to maintain liaison communications with the county under—

A: If that's part of the emergency plan, then yes.

At the close of proofs, the trial court denied the parties' competing motions for a directed verdict, simply stating that "there are factual issues that can go either way." In addition, the trial court denied plaintiff's request to instruct the jury as a matter of law that plaintiff engaged in "protected activity" under the WPA when he attended the Liberty Diner meeting, and when he attended the December 2019 meeting about the earlier Liberty Diner meeting.

During final instructions, the trial court instructed the jury about the elements of a WPA claim. In addition, regarding the breach-of-contract claim, the trial court instructed the jury as follows:

In this case, the parties do not dispute that there was a contract between them. Plaintiff claims he is entitled to severance pay from defendant the City of Flushing. Defendant points out that plaintiff is not entitled to severance pay if his actions amount to gross malfeasance. This means plaintiff had to have been involved in active misconduct. The malfeasance must have been very obvious and unacceptable. If you find plaintiff committed misconduct and it was very obvious and unacceptable, your verdict shall be for the defendant. If you find the plaintiff either did not commit misconduct, or that his misconduct was acceptable or not obvious, then your verdict shall be for plaintiff.

Ultimately, the jury found that plaintiff did not engage in protected activity under the WPA, either by "reporting verbally or in writing a violation or suspected violation of law, rule, or regulation to a public body," or by "participating in an investigation, hearing, or inquiry by a public body." In addition, the jury found that plaintiff committed "gross malfeasance." These findings disposed of both the WPA claim and the breach-of-contract claim.[8]

About a month after trial, defendant city moved for costs and attorney fees. Defendant city argued that plaintiff's action was "frivolous" for the purposes of MCR 2.625 and MCL 600.2591 and, alternatively, that it was entitled to offer-of-judgment sanctions under MCR 2.405. With regard to the latter argument, defendant city observed that in April 2022, its counsel sent the following offer to plaintiff:

Please consider this letter as a written notification to your client that the defendants are willing to stipulate to the entry of a judgment in the amount of $50,000, which is deemed to include all costs and interest then accrued to cover all counts remaining in this litigation. This letter is being sent pursuant to MCR 2.405.

---

[8] The jury was polled, indicating a vote of five to two.

-6-

According to defendant city, plaintiff did not respond to the offer, which constitutes a rejection under MCR 2.405.

The trial court ruled against defendant city at the motion hearing, reasoning as follows:

> I looked at and, you know, yes, I have it tabbed because to find this frivolous, there is a standard. . . . I certainly don't believe that the primary purpose of this lawsuit was to harass, embarrass, or injure any of the defendants. I don't believe that. I believe that Mr. Barrett truly believed what he was pursuing here. I believe that.

> * * *

> What's in front of the Court right now is do I believe that this was frivolous, and in the interest of justice, is it the right thing to do to assess these costs. I take very seriously your argument regarding—I don't know if you said these words, but the chilling effect.

> * * *

> The purpose of Whistleblower. The purpose of the Civil Rights Act. Again, once I've decided, I don't—I believe Mr. Barrett believed he was wrongfully terminated. . . .

> * * *

> I hate what was done to the Flushing council people. I don't like it as a Court, but I think I will dislike more if I punish Mr. Barrett for pursuing what he believed was right in this instance.

On June 14, 2023, the trial court entered an order memorializing its decision on the record. The parties now appeal.

## II. DOCKET NO. 365671

### A. SUMMARY DISPOSITION

Plaintiff first argues that the trial court erred by failing to grant summary disposition in his favor regarding his WPA claim.[9] According to plaintiff, defendants violated the WPA in two respects. First, defendants fired him for attending the Liberty Diner meeting. Second, defendants fired him for performing his job duties, which included "communicat[ing] by email and by

---

[9] Plaintiff also briefly suggests that the trial court erred by failing to grant a directed verdict in his favor. However, because this issue was not raised in the statement of questions presented, nor was it sufficiently briefed, we consider it waived. See *English v Blue Cross Blue Shield of Mich*, 263 Mich App 449, 459; 688 NW2d 523 (2004); *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992).

telephone as 'liaison' between Defendant City of Flushing and the County Officials." With regard to the latter argument, plaintiff argues that the city charter requires such communication by the city manager.

"This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Id*. at 120.]

MCL 15.362 of the WPA provides as follows:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Under MCL 15.362, a plaintiff must demonstrate three elements to establish a prima facie case that the defendant violated the WPA:

(1) The employee was engaged in one of the protected activities listed in the provision.

(2) [T]he employee was discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment.

(3) A causal connection exists between the employee's protected activity and the employer's act of discharging, threatening, or otherwise discriminating against the employee. [*Wurtz v Beecher Metro Dist*, 495 Mich 242, 251-252; 848 NW2d 121 (2014) (footnotes omitted).]

"The plain language of the statute provides protection for two types of 'whistleblowers': (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action." *Henry v City of Detroit*, 234 Mich App 405, 409; 594 NW2d 107 (1999). A "type 1" whistleblower is "one who, on his own initiative, takes it upon himself to

communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation." *Id*. at 410. "In other words, . . . type 1 whistleblowers [are] initiators, as opposed to type 2 whistleblowers who participate in a previously initiated investigation or hearing at the behest of a public body." *Id*. "If a plaintiff falls under either category, then that plaintiff is engaged in a 'protected activity' for purposes of presenting a prima facie case." *Id*. A type 2 whistleblower is not required "to report or testify regarding a violation or suspected violation of a law, regulation, or rule" to be entitled to the protections of the WPA. *Shaw v Ecorse*, 283 Mich App 1, 11; 770 NW2d 31 (2009).

In this case, the trial court did not err by refusing to grant summary disposition in favor of plaintiff with regard to his WPA claim. Concerning the Liberty Diner meeting, the individual defendants clearly explained in their respective depositions that plaintiff was not fired simply because he attended that meeting. Rather, they fired him, at least in part, because he failed to inform them about the Liberty Diner meeting. As incoming members of defendant city council, the individual defendants had a reasonable right to expect that the city manager would inform them about meetings between other city officials about the direction of city government which would directly impact their roles as public officials. At a minimum, given the deposition testimony, there was a question of fact as to whether "[a] causal connection exists between the employee's protected activity and the employer's act of discharging, threatening, or otherwise discriminating against the employee." See *Wertz*, 495 Mich at 251-252. In other words, assuming that plaintiff's attendance at the Liberty Diner meeting constituted "protected activity," there was a question of fact as to whether plaintiff was fired because of that protected activity, or whether plaintiff was fired because he failed to faithfully perform his job duties as city manager relative to the individual defendants' positions on the city council.

Concerning the March 20, 2020 hearing and the surrounding communications by plaintiff to those involved with the GCEC, there was a question of fact for essentially the same reasons. The individual defendants testified that plaintiff was fired, at least in part, because he contravened the process for having a city-council member appointed to the body to obtain a quorum. Certainly, it was reasonable for the individual defendants to expect that the process would move forward on an expedited basis without interference by the city manager at his own initiative. In other words, assuming that plaintiff's participation in the March 20, 2020 hearing and the surrounding communications by him constituted "protected activity," there was a question of fact as to whether he was fired because of that protected activity, or because he failed to faithfully perform his duties as city manager.[10]

Accordingly, the trial court did not err by failing to grant summary disposition in favor of plaintiff with regard to his WPA claim.

---

[10] To illustrate the point, suppose that an employee is subpoenaed to testify before a public body and commits perjury during the hearing. While the employer undoubtedly is prohibited by the WPA from firing the employee because he was subpoenaed to testify, there is no principled reason why the employee could not be fired for committing perjury. Thus, participation in a hearing does not necessarily immunize all conduct during the hearing.

B. JURY INSTRUCTIONS

Plaintiff argues that the trial court erred by failing to give his requested jury instructions, which essentially would have informed the jury that he engaged in protected activity, that he was fired because he engaged in protected activity, and that a verdict must be rendered in his favor unless defendant city proved that it would have reached the same decision to fire him for a lawful reason. In other words, the requested jury instructions would have directed the jury to find that plaintiff established a prima facie case under the WPA. We disagree with plaintiff.

"Jury instructions are reviewed in their entirety to determine whether they accurately and fairly presented the applicable law and the parties' theories." *Guerrero v Smith*, 280 Mich App 647, 660; 761 NW2d 723 (2008). "We review for an abuse of discretion the trial court's decision regarding supplemental jury instructions." *Id*. "An abuse of discretion occurs when the court's decision falls outside the range of principled and reasonable outcomes." *Id*. "Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

"A trial court may give an instruction not covered by the standard instructions as long as the instruction accurately states the law and is understandable, concise, conversational, and nonargumentative." *Bordeaux v Celotex Corp*, 203 Mich App 158, 169; 511 NW2d 899 (1993). As noted, to establish a prima facie case under the WPA, "a plaintiff must show that (1) the plaintiff was engaged in a protected activity as defined by the WPA, (2) the plaintiff was discharged, and (3) a causal connection existed between the protected activity and the discharge." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016) (quotation marks and citation omitted). However, the employer may prevail in the case "if it offers a legitimate reason for its action and the plaintiff fails to show . . . that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action." *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013) (citation omitted). Moreover, our Supreme Court has held in civil-rights cases that "a defendant may avoid a finding of liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in the decision." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 133; 666 NW2d 186 (2003), citing *Price Waterhouse v Hopkins*, 490 US 228, 244-245; 109 S Ct 1775; 104 L Ed 2d 268 (1989).

In this case, plaintiff argues that the jury should have been instructed that he established a prima facie case under the WPA with regard to the following three events: (1) the Liberty Diner meeting, (2) the December 2019 meeting about the Liberty Diner meeting, and (3) his conduct surrounding the March 20, 2020 hearing, as well at the hearing itself. Instead, the trial court asked the jury whether plaintiff was a "type 1" whistleblower because he "report[ed] verbally or in writing a violation or suspected violation of a law, rule, or regulation to a public body" and, additionally, whether plaintiff was a "type 2" whistleblower because he "participat[ed] in an investigation, hearing, or inquiry by a public body." See MCL 15.362. The jury answered both questions in the negative.

Plaintiff provides no argument that he was a "type 1" whistleblower as to any of the three events at issue. That is, plaintiff does not argue that he reported a violation or suspected violation

-10-

of a law, rule, or regulation to a public body. Thus, we have no reason to disturb the trial court's rulings on this basis.

We agree with plaintiff, however, that there may be evidence in the record that he was a "type 2" whistleblower. In particular, the December 2019 meeting about the Liberty Diner meeting possibly may be considered an "inquiry by a public body" in which plaintiff participated. The three individual defendants may have, both individually and collectively, constituted a "public body," see MCL 15.361(d)(*iii*),[11] and the meeting appears to have been arranged by them to question plaintiff about the lunch at the Liberty Diner. Thus, the meeting may satisfy a reasonable definition of "investigation" or "inquiry." Therefore, because the December 2019 meeting between the individual defendants and plaintiff may have constituted "an investigation, hearing, or inquiry held by a public body," plaintiff may have engaged in "protected activity" as a "type 2" whistleblower. See *Henry*, 234 Mich App at 410.[12] However, the jury in this case decided otherwise, that plaintiff did not "engage in protected activity under the Michigan Whistleblowers' Protection Act by participating in an investigation, hearing, or inquiry by a public body."

Nonetheless, while the evidence in the record possibly could support that plaintiff was a "type 2" whistleblower, we cannot conclude that the trial court erred by refusing to give his requested jury instructions for two reasons. First, the jury instructions would have indicated that plaintiff established causation. However, as previously explained, the evidence did not clearly establish that plaintiff showed causation with respect to the Liberty Diner meeting or the March 20, 2020 hearing and the surrounding communications. Similarly, the evidence did not clearly establish that plaintiff showed causation with respect to the December 2019 meeting. To the contrary, the individual defendants indicated at trial that they were concerned with the fact that plaintiff was not forthright in discussing the Liberty Diner meeting with them.

Second, we believe that plaintiff has failed to properly address the merits of this issue. For example, MCR 2.515 governs special-verdict forms, generally providing that "[t]he court may require the jury to return a special verdict in the form of a written finding on each issue of fact, rather than a general verdict." MCR 2.515(A). "When a case is submitted to the jury for a special verdict, the parties are entitled to have all of the controlling factual issues submitted to the jury." 3 Mich Ct Rules Prac, Text § 2515.6 (8th ed). But, while plaintiff has thoroughly briefed WPA law, plaintiff has not briefed the extent to which juries should be prohibited from finding an element of a claim in a civil case, which plaintiff was asking to be done with the inclusion of his proposed jury instructions. Indeed, the trial court did not expressly misinform the jury in any fashion. [Sentence Deleted.] Accordingly, because plaintiff did not fully brief this issue, we

---

[11] MCL 15.361(d)(*iii*) provides that "public body" includes a "city . . . or any member or employee thereof." It also provides that "public body" includes a "council . . . or any member . . . thereof."

[12] We are not convinced that the other two events identified by plaintiff constituted "protected activity." The Liberty Diner meeting arguably was not an "investigation, hearing, or inquiry," MCL 15.362, but, rather, was a session where certain council members arguably met to plot against other council members. Further, plaintiff's participation in the March 20, 2020 hearing arguably did not constitute "protected activity" because he was not "requested" to participate in that hearing. *Id*.

decline to do so on plaintiff's behalf or grant him the relief requested. See *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992).

## C.  GREAT WEIGHT OF THE EVIDENCE

Plaintiff argues that the jury verdict was against the great weight of the evidence. According to plaintiff, trial testimony established that he was fired for engaging in protected activity, so the jury's finding that he did not engage in protected activity—the first element of a WPA claim—was unwarranted. Plaintiff suggests that a new trial is warranted so the jury may address the remaining elements of his WPA claim. However, this issue is waived because plaintiff failed to move for a new trial below. See *Buckeye Marketers, Inc v Finishing Servs, Inc*, 213 Mich App 615, 617; 540 NW2d 757 (1995). Therefore, we decline to address it.

## D.  CLOSING ARGUMENT

Plaintiff argues that the closing argument of defense counsel, in which he referenced plaintiff "attacking" civil liberties, was prejudicial and warrants reversal. We agree with plaintiff that the part of closing argument he challenges was inappropriate. But, we conclude that plaintiff is not entitled to relief.

Because plaintiff failed to object at trial, this issue is unpreserved. See *Kubisz v Cadillac Gage Textron, Inc*, 236 Mich App 629, 640-641; 601 NW2d 160 (1999), abrogated in part on other grounds by *Ormsby v Capital Welding, Inc*, 471 Mich 45; 864 NW2d 320 (2004). "[I]n a civil case in which a party assigns as error on appeal remarks of counsel during closing arguments, but fails to object to those remarks at trial, the party must prove that (1) the remarks were so prejudicial as to have denied the party a fair trial and that (2) any resulting prejudice could not have been cured by a curative instruction." *Badiee v Brighton Area Sch*, 265 Mich App 343, 373-374; 695 NW2d 521 (2005). "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 25; 837 NW2d 686 (2013) (quotation marks and citation omitted).

Plaintiff challenges the following part of closing argument by defense counsel:

Rules, concepts, actually was developed back in 1787. Back then, a constitution was released, and in two years, that constitution was ratified. One of the central tenets to [our] constitution was the concept of a legislative body. That we as citizens would elect people to make decisions for us. . . .

That is as basic as it comes in the United States of America, ladies and gentlemen. That that is a central foundation of what we are as a country and what we are as a people. A representative government. And it didn't just stop in the constitution. Every state in this union took on that same principle. And within each state, every county took on that principle, and within each county, each city and municipality took on that concept. And we might have different names for it. They might call it a commission or a city council or a house of representatives, but it's all the same.

Everything starts with us choosing our representatives and our representatives acting on our behalf. It is not appointed bureaucrats, it is not appointed city managers, it is not people that did not go in front of the voters and answer to the voters, it is the representatives. That is a significant concept in this case.

You know, there simply is no excuse that anybody has offered to you either in this case or that we can think of to ever take away or ever pause our legislative functions, either in the world, in our nation at large, or even in the little City of Flushing. Nothing. There is never an opportunity where they should be without a legislative body even for a day.

Over time we have seen that people attack these rights. We know on January 6th people attacked those rights. We know that sometimes people want to pass restrictive voter laws to attack those rights. And there are other more insidious ways of attacking these rights that we have as citizens. But over time and every time this happens, we stand up to it. We fight against it. We say our legislative function is supreme. It is sacred. There is never an excuse.

And ladies and gentlemen, the concept of a legislative body being operating at full functioning all the time is sacred. There is never, ever a time that we should be without it, and this is simply not negotiable ever. Except for Brad Barrett.

The second concept I want to talk to you about is a phrase you've often heard, but sometimes people don't really put much meaning into it. And the phrase says this; the truth, the whole truth, and nothing but the truth. . . .

* * *

Unfortunately, Brad Barrett never got either of these concepts. Either of them. Not only has he attacked the fundamental nature of our legislative system and the body, but he has ignored the truth.

These comments were inappropriate for several reasons. First, they implied that this case somehow is a critical commentary on the existence of representative democracy and constitutional governance, and that a finding in favor of plaintiff is tantamount to a rejection of those principles. Second, it arguably is incorrect to suggest that a legislative body cannot be paused "even for a day." Legislators travel and meet at scheduled times and days. Indeed, the Michigan Constitution suggests that the legislative term is divided into separate "sessions." See Const 1963, art 4, § 13. Third, the comments invoke "January 6th" and "restrictive voter laws" to "attack" the rights guaranteed by our system of government. Such references were inflammatory and unnecessary and bore no relationship to the evidence presented at trial.

Nonetheless, we conclude that reversal for this unpreserved issue is not warranted. Throughout this seven-day trial, it was apparent that plaintiff's conduct, specifically with regard to the March 20, 2020 hearing and surrounding communications, was intended to delay defendant city council from having a quorum. Thus, defense counsel was not entirely incorrect to suggest that plaintiff attempted to obstruct legislative functioning. Moreover, plaintiff's counsel started

-13-

his own closing argument with a reference to the Oliver North trial. Consequently, plaintiff's counsel arguably was himself responsible for expanding the scope of this case to broader issues.[13] Further, plaintiff's counsel could have promptly objected and stopped the inappropriate comments, as well as obtained a curative instruction. Finally, and perhaps most importantly, plaintiff's counsel seized upon the comments at issue during his rebuttal, stating as follows:

> I'm sort of glad Mr. Brickley took us way back in a time machine to 1787 and the constitution (inaudible). You know, remember our founding fathers and those white (inaudible) waves, and it's the summertime and it's hot as heck and the flies are terrible, and they came up with that majestic law establishing the president, the congress, the legislature, the congress and the judiciary. You know, and what a great time that was.
>
> And you know the most important thing—and that's important, you know, for the people that study government and political science (inaudible), but you know what's the most important part of that meeting that they had there? The first amendment. They established ten amendments, okay, that can—amendments to the constitution, and the first one is nobody shall abridge a person's, an American's, our right to speech. No law, no action can be taken punishing someone because they spoke. That's the first amendment to that great document that Mr. Brickley himself alluded to.
>
> And that's exactly what they did to Brad Barrett, he spoke at a public meeting, okay, which all Americans can do, and they fired him for it. . . .

Under these circumstances, where plaintiff's counsel attempted to use the comments of defense counsel to his benefit, reversal is not warranted.

### E. GROSS MALFEASANCE

Plaintiff argues that the trial court erred by instructing the jury that it should find in favor of defendant city on the breach-of-contract claim if plaintiff committed "gross malfeasance," which the trial court defined as "active misconduct" that is "very obvious and unacceptable." We disagree.[14]

"The proper interpretation of a contract and the legal effect of a contractual clause are questions of law that we review de novo." *Sherman-Nadiv v Farm Bureau Gen Ins Co of Mich*, 282 Mich App 75, 78; 761 NW2d 872 (2008).

---

[13] We acknowledge that the reference to Oliver North was briefer than the comments of defense counsel.

[14] The parties do not dispute that the employment contract here is valid, although we note the possibility that one city council cannot contractually bind a subsequent city council as to the selection of a city manager. See *City of Hazel Park v Potter*, 169 Mich App 714, 722; 426 NW2d 789 (1988).

"Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003) (quotation marks and citation omitted). Thus, when a contract term is unambiguous, the trial court should instruct the jury as to the meaning of that term. See *Hayes v Cummings*, 99 Mich 206, 208; 58 NW 46 (1894) ("There is no doubt as to the meaning of the term 'purchase scale.' It clearly meant the scale made at the time of the purchase. There being no doubt as to the meaning of the contract, it was the duty of the court to construe it, and the jury should have been instructed to adopt the purchase scale.").

In *N Country Agency, Inc v Frankenmuth Mut Ins Co*, 269 Mich App 685; 713 NW2d 811 (2005), this Court addressed whether the defendant was justified in terminating the plaintiff's agency contract on the basis of "malfeasance" by the plaintiff. *Id*. at 687. This Court ruled that the defendant was entitled to summary disposition because there was no genuine issue of material fact that the plaintiff was guilty of "malfeasance," as that term was used in the agency contract:

> "Malfeasance" was not defined in the agency contract, so it is appropriate to interpret the term in accordance with its commonly used meaning. Black's Law Dictionary, 7th ed, defines "malfeasance" as "[a] wrongful or unlawful act . . . ." *Random House Webster's College Dictionary* (2001) defines "malfeasance" as "misconduct or wrongdoing . . . ." Here, defendant terminated plaintiff's agency contract on the basis of coverage inquiries made by insureds to whom plaintiff had provided proofs of insurance, but who were never actually insured with defendant. . . . While the employees were unable to define "malfeasance," their testimony does not alter the essential terms of the contract or the commonly used meaning of "malfeasance." [*Id*. at 687-688 (citation omitted).]

Thus, *N Country Agency* stands for the proposition that a court may consider the dictionary definition of "malfeasance" when that term is undefined by contract. If so, it logically follows that the trial court here was justified in considering dictionary definitions to determine the meaning of "gross malfeasance."

In this case, the trial court instructed the jury that "gross malfeasance" means "plaintiff had to have been involved in active misconduct. The malfeasance must have been very obvious and unacceptable." This instruction fairly presented the issue of contractual "gross malfeasance" to the jury. See *Guerrero*, 280 Mich App at 660. As noted, this Court has defined "malfeasance" as "misconduct or wrongdoing." See *N Country Agency*, 269 Mich App at 687-688. Moreover, this Court has defined "gross" as " 'flagrant and extreme.' " *People v Dewald*, 267 Mich App 365, 383; 705 NW2d 167 (2005), abrogated in part on other grounds by *People v Melton*, 271 Mich App 590; 722 NW2d 698 (2006), quoting *Random House Webster's College Dictionary* (2000). Taken together, these cases indicate that a working definition of "gross malfeasance" is "flagrant and extreme misconduct." The trial court's instruction here that "gross malfeasance" is, essentially, "very obvious and unacceptable active misconduct" is reasonably consistent with how we previously have interpreted the terms "gross" and "malfeasance." Accordingly, the trial court did not err by its instruction to the jury.

## F.  DISMISSAL OF PARTIES

Finally, plaintiff argues that the trial court erred by dismissing the individual defendants—Karlichek, Sullivan, and Good—during trial.  According to plaintiff, the WPA allows lawsuits against natural persons who act as agents on behalf of the employer-entity.

We need not decide this question.  Any error in dismissing the individual defendants is harmless because, as we have explained, the jury's finding in favor of defendant city should not be disturbed.  That is, given the appellate issues before us, the jury did not reversibly err by finding that plaintiff did not sustain his WPA claim, or by finding that plaintiff committed "gross malfeasance" for the purposes of his breach-of-contract claim.  Therefore, because defendant city is not liable to plaintiff for either of these claims, and because plaintiff does not argue that the individual defendants should be liable to him under a different theory, it follows that any error in dismissing those defendants is harmless.

## III.  DOCKET NO. 366709

## A.  MCR 2.625 AND MCL 600.2591

Defendants argue that the trial court erred by declining to award their attorney fees incurred as a result of this litigation under MCR 2.625 and MCL 600.2591.  According to defendants, this action was "frivolous" because "the facts of this matter make it indisputable that Plaintiff had no reasonable basis to believe the facts underlying the claims he brought against Defendants, and also make indisputable that such claims were devoid of legal merit."  We disagree.

"We review de novo . . . questions of law, including the interpretation of statutes, and the construction, interpretation, and application of the court rules." *Truel v City of Dearborn*, 291 Mich App 125, 131; 804 NW2d 744 (2010) (citations omitted).  "A trial court's finding that an action is frivolous is reviewed for clear error." *Kitchen v Kitchen*, 465 Mich 654, 661; 641 NW2d 245 (2002).  "A decision is clearly erroneous where, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. at 661-662.

MCR 2.625(A)(2) provides that "if the court finds on motion of a party that an action or defense was frivolous, costs shall be awarded as provided by MCL 600.2591."  MCL 600.2591, in turn, provides as follows:

> (1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

> * * *

> (3) As used in this section:

> (a) "Frivolous" means that at least 1 of the following conditions is met:

(*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(*iii*) The party's legal position was devoid of arguable legal merit.

"The purpose of imposing sanctions for asserting frivolous claims is to deter parties and attorneys from filing documents or asserting claims and defenses that have not been sufficiently investigated and researched or that are intended to serve an improper purpose." *BJ's & Sons Constr Co, Inc v Van Sickle*, 266 Mich App 400, 405; 700 NW2d 432 (2005) (quotation marks and citations omitted). "[M]erely because this Court concludes that a legal position asserted by a party should be rejected does not mean that the party was acting frivolously in advocating its position." *Kitchen*, 465 Mich at 663.

The trial court did not clearly err by finding that this action was not frivolous. Initially, we note that the jury vote after trial was five to two in favor of defendant city; the mere fact that the jury was not unanimous suggests that this action was not frivolous. More importantly, after reviewing the record, we are persuaded that plaintiff maintained good-faith claims, particularly with regard to the two claims that proceeded to trial—the WPA claim and the breach-of-contract claim.[15] The WPA claim arguably is supported by the fact that defendants fired plaintiff, at least in part, for his actions related to the Liberty Diner meeting. As noted, MCL 15.362 prohibits firing an employee for the mere reason that he attended a meeting by a public body. Moreover, concerning the breach-of-contract claim, it is arguable that plaintiff's conduct between November 2019 and March 2020 was indicative of a commonplace power struggle within city government, not "gross malfeasance." Plaintiff could reasonably argue that he was entitled to his contractual severance. Further, the deposition testimony, trial testimony, and other documentary evidence are reasonably consistent with the facts asserted by plaintiff throughout this case.

To summarize, the record indicates that the claims maintained by plaintiff were consistent with the facts, legally defensible, and would entitle him to monetary relief. Thus, the trial court did not clearly err by finding that this action was not "frivolous," as the record does not show that his "primary purpose in initiating the action . . . was to harass, embarrass, or injure" defendants; he "had no reasonable basis to believe that the facts underlying [his] legal position were in fact true"; or his "legal position was devoid of arguable legal merit." See MCL 600.2591(3)(a)(*i*)-(*iii*). We affirm the trial court on this issue.

## B. MCR 2.405

Defendants alternatively argue that the trial court erred by declining to award most of their attorney fees incurred as a result of this litigation under MCR 2.405. According to defendants,

---

[15] While the third and fourth counts of the complaint were dismissed before trial, the inclusion of multiple tangential claims in pleadings is routine and does not warrant sanctions absent extraordinary circumstances not present here.

because plaintiff rejected their April 2022 pre-trial settlement offer of $50,000, instead electing to proceed to trial and suffer a judgment of no cause of action, they are entitled to attorney fees incurred after plaintiff's rejection of that settlement offer. We disagree.

We review for an abuse of discretion a trial court's decision whether to award attorney fees to a party under MCR 2.405. *Andreson v Progressive Marathon Ins Co*, 322 Mich App 76, 92; 910 NW2d 691 (2017).

MCR 2.405 provides, in relevant part:

(A) Definitions. As used in this rule:

(1) "Offer" means a written notification to an adverse party of the offeror's willingness to stipulate to the entry of a judgment in a sum certain, which is deemed to include all costs and interest then accrued. If a party has made more than one offer, the most recent offer controls for the purposes of this rule.

* * *

(D) Imposition of Costs Following Rejection of Offer. If an offer is rejected, costs are payable as follows:

(1) If the adjusted verdict is more favorable to the offeror than the average offer, the offeree must pay to the offeror the offeror's actual costs incurred in the prosecution or defense of the action.

* * *

(3) The court shall determine the actual costs incurred. The court may, in the interest of justice, refuse to award an attorney fee under this rule. Interest of justice exceptions may apply, but are not limited to:

(*i*) cases involving offers that are token or de minimis in the context of the case; or

(*ii*) cases involving an issue of first impression or an issue of public interest.

"The purpose of MCR 2.405 is to encourage parties to settle matters prior to trial." *Andreson*, 322 Mich App at 94 (quotation marks and citation omitted). "[A] grant of attorney fees under MCR 2.405(D) should be the rule rather than the exception." *Id*. (quotation marks and citation omitted). However, "[t]he court may, in the interest of justice, refuse to award an attorney fee under this rule." MCR 2.405(D)(3). "[T]his Court has held that, 'absent unusual circumstances,' the 'interest of justice' does not preclude an award of attorney fees under MCR 2.405." *Luidens v 63rd Dist Ct*, 219 Mich App 24, 32; 555 NW2d 709 (1996) (citations omitted). "Factors such as the reasonableness of the offeree's refusal of the offer, the party's ability to pay, and the fact that the claim was not frivolous are too common to constitute the unusual circumstances encompassed by the 'interest of justice' exception." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 391; 689 NW2d 145 (2004) (quotation marks and citation omitted).

"However, the exception may be applicable when an offer is made in the spirit of gamesmanship rather than a sincere effort at negotiation, or when litigation of the case affects the public interest, such as a case resolving an issue of first impression." *Id*. (cleaned up). In some cases, "there is a public interest in having an issue judicially decided rather than merely settled by the parties. In such cases, this public interest may override MCR 2.405's purpose of encouraging settlement." *Luidens*, 219 Mich App at 36.

The trial court did not abuse its discretion by invoking the "interest of justice" exception to MCR 2.405. The trial court expressly reasoned that it was declining to award defendants' attorney fees under MCR 2.405 because of the "purpose" of the WPA. Arguably, as defendants observe, the trial court erred to the extent that it suggested that a case involving a WPA claim is categorically excluded from MCR 2.405. However, an overall review of the trial court's comments indicates that it was concerned with the operation of city government, and how the facts of this case reflected upon that operation. Moreover, the record suggests that the facts of this case were locally newsworthy. Consequently, this was a case of "public interest" because it involved the WPA, a remedial statute, see *Anzaldua v Neogen Corp*, 292 Mich App 626, 631; 808 NW2d 804 (2011), because it involved the operation of city government, and because it was locally newsworthy. These three facts, taken together, support the trial court's exercise of its discretion to not award attorney fees under MCR 2.405 because this case is a matter of "public interest." Therefore, we affirm the trial court on this issue.

## IV. CONCLUSION

There are no errors warranting relief. Accordingly, we affirm.

/s/ James Robert Redford
/s/ Michael F. Gadola
/s/ Michael J. Riordan